```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,               :
                                        :
            -against-                   :           **MEMORANDUM & ORDER**
                                        :             19-cr-00559 (DLI)
DAQUAN CHAVOUS,                         :
                                        :
                         Defendant.     :
-------------------------------------------------------x
```

**DORA L. IRIZARRY, United States District Judge:**

Defendant Daquan Chavous ("Defendant") is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 992(g)(1) and 924(a)(2). *See*, Indictment, Dkt. Entry No. 7. Defendant moved to suppress the seized firearm and his post-arrest statements. *See*, Notice of Mot. and Mem. of Law in Supp. of Mot. to Suppress ("Mot. to Suppress"), Dkt. Entry No. 14. Defendant submitted an affidavit in support of the motion. *See*, Def.'s Aff. in Supp. of Mot. to Suppress ("Def. Aff."), Dkt. Entry No. 14-1. The Government opposed the motion. *See*, Gov't's Mem. of Law in Opp'n to Mot. to Suppress ("Mot. Opp'n"), Dkt. Entry No. 20. Defendant replied. *See*, Def.'s Reply to Resp. to Mot. to Suppress ("First Reply"), Dkt. Entry No. 21.

A suppression hearing was held on April 22, 2021. *See*, Minute Entry dated April 22, 2021; *See also,* Transcript of Criminal Cause for Suppression Hearing ("Tr."), Dkt. Entry No. 58. After the hearing, the Court received further briefing from the parties. Defendant submitted a memorandum in support of the motion. *See*, Def.'s Post-Hearing Mem. in Supp. of Mot. to Suppress ("Def. Mem."), Dkt. Entry No. 57. The Government opposed. *See*, Gov't's Mem. of Law in Opp'n to Def.'s Post-Hearing Mem. in Supp. of Mot. to Suppress ("Opp'n"), Dkt. Entry No. 59. Defendant replied. *See*, Def.'s Post-Hearing Reply Mem. ("Reply"), Dkt. Entry No. 62. For the reasons set forth below, Defendant's motion is granted.

## BACKGROUND

At the suppression hearing, Police Officer Joseph Dionisi ("Dionisi") of the New York City Police Department ("NYPD") testified on behalf of the Government. At the time of Defendant's arrest on October 26, 2019, Dionisi was assigned to the 77th Precinct Anticrime Unit in Brooklyn. Tr. at 9:22-10:9. No other witness testified for the Government. The Court finds Dionisi credible to the extent indicated herein. The Government also presented closed circuit television ("CCTV") surveillance footage that captured the entire interaction between Dionisi and Defendant on October 26, 2019, but without sound. *See*, CCTV Footage of 1940 Pacific Street on October 26, 2019 ("CCTV Footage"), Gov't Ex. 3.[1] In addition, the Government presented Dionisi's body camera footage, which partially recorded Defendant's arrest. *See*, Dionisi's Body Camera Footage ("Body Cam Footage"), Gov't Ex. 4. Defendant did not present any witness testimony at the hearing but did introduce certain exhibits into evidence without objection. *See*, Zoomed in Version of CCTV Footage of 1940 Pacific Street on October 26, 2019, Def. Ex. A; NYPD, *Patrol Guide – Use of Body-Worn Cameras* (Jan. 8, 2018), Def. Ex. C.

At approximately 12:27 AM on October 26, 2019, Defendant exited a building located at 1940 Pacific Street in Brooklyn holding a cellphone in his right hand. CCTV Footage at 00:07-09.[2] He walked toward the intersection of Ralph Avenue and Pacific Street (the "Intersection") and sat on an electrical box a few feet from the Intersection. *Id.* at 00:10-27; *See also*, Google Maps Screenshot of the Vicinity of 1940 Pacific Street, Gov't Ex. 1B. While he greeted a passerby with a handshake, Defendant did not exchange anything with anyone before or as he was sitting

---

[1] The date stamp on the CCTV footage is "10-24-2019," showing that the footage is from October 24, 2019. However, the parties agree that the date stamp is wrong and the footage, in fact, is from October 26, 2019. *See*, Tr. at 27:2-13.

[2] The time marks cited throughout this Memorandum and Order represent the points in the actual length of the video and not the time stamp noted on the top left corner of the CCTV Footage.

on the electrical box. CCTV Footage at 01:05-09. Notably, there was not a lot of pedestrian traffic at that time. *Id.*

At approximately 12:30 AM on October 26, 2019, Dionisi, Officer Patrick Craig ("Craig"), and Sergeant John Nicolosi ("Nicolosi") (together, the "Officers") were inside a vehicle conducting an anticrime patrol around the Intersection. Tr. at 10:21-25, 11:20-23. Nicolosi was driving the vehicle. *Id.* at 12:4-7. Craig was in the front passenger seat. *Id.* Dionisi was in the rear passenger seat. *Id*. Anticrime patrols involve officers in plainclothes riding in unmarked vehicles with the purpose of deterring violent crimes and gang activities. *Id.* at 10:11-20. According to Dionisi, there had been numerous reports of incidents involving firearms, assaults, and narcotics at the afterhours club located at 1940 Pacific Street. *Id.* at 12:17-13:9. Dionisi personally had responded to the location approximately 10 to 15 times. *Id*. at 14:5-7.

As the Officers were driving on Pacific Street approaching the Intersection, Dionisi, from inside the vehicle, saw Defendant sitting on the electrical box, hunched over with his hands between his legs. *Id.* at 16:17-17:24, 17:18-20, 18:11-15. Although he could not see what Defendant had in his hands, Dionisi believed that Defendant was rolling a marijuana cigarette because the Intersection is "a high narcotics area." *Id.* at 18:21-19:1, 41:23-25. Dionisi decided to investigate the situation further. *Id.* at 47:2-6.

Once the Officers' vehicle was stopped behind Defendant, Dionisi exited the vehicle holding a flashlight in his right hand and shining it on Defendant as he approached Defendant. *Id.* at 19:15-16, 21-22; CCTV Footage at 01:11-18. When he got within one or two feet of Defendant, Dionisi realized that Defendant was holding a cellphone in his hands not a marijuana cigarette. Tr. at 20:17-23, 59:15-19; CCTV Footage at 01:15. Nonetheless, Dionisi continued towards Defendant. *See*, CCTV Footage at 01:16.

3

Dionisi testified that he did not announce himself as a police officer when he approached Defendant. *Id.* at 19:25-20:1. He also testified that he did not show his badge to Defendant but wore it around his neck, visible over his clothes. *Id.* at 12:11-14, 57:16-17. However, the CCTV footage showed that, immediately upon approaching Defendant, while shining the flashlight on him, Dionisi held something in his left hand, which he showed to Defendant before tucking it under his chest, as though he were displaying a badge. *See*, CCTV Footage at 01:17-20. Dionisi testified that, once he approached Defendant, he saw Defendant make "a quick motion with his right forearm into his waistband." Tr. at 20:2-4. The CCTV footage, on the contrary, showed that Defendant did not move his arms at all while sitting on the electrical box. *See*, CCTV Footage at 01:16-19.

As soon as Defendant jumped down from the electrical box, Dionisi saw Defendant "ma[k]e a quick motion with his right forearm to his waistband" and started "blading his body." Tr. at 20:5-10, 67:17-24. Dionisi explained that, by "blading," Defendant was turning his body away from Dionisi, which led him to believe that Defendant was concealing a firearm within his waistband. *Id.* at 20:14-21:5. Dionisi testified that the waistband is the most common area where an individual conceals a firearm. *Id.* at 32:2-11. Dionisi further stated that he has had made 20 to 30 arrests involving firearms in his career and five to ten of them involved movements similar to those of Defendant. *Id.* at 32:15-20. As Defendant turned his body away from Dionisi, Dionisi put his left arm out, touching Defendant's chest to stop him from moving forward. *Id.* at 66:6-13; CCTV Footage at 01:20. This initial interaction between Dionisi and Defendant took place within four seconds. CCTV Footage at 01:16-20.

Dionisi proceeded to frisk Defendant's left leg and moved up to his waistband. *Id.* at 01:21-29; Tr. at 66:23-67:6. Dionisi felt an object at the waistband that he believed to be "the handle of

a firearm." Tr. at 21:13-22.  At this point, Dionisi, with Craig's assistance, handcuffed Defendant and placed him under arrest.  *Id.* at 22:11-16; *See also*, CCTV Footage at 01:31-02:28 (depicting Dionisi handcuffing Defendant while both Craig and Nicolosi, now out of the vehicle, stand next to Defendant).

Dionisi's body camera captured a portion of Defendant's arrest with both sound and video.[3] *See*, Body Cam Footage; Tr. at 35:15-21.  The recording begins with the Officers holding Defendant's arms behind his back and cuffing him.  *See*, Body Cam Footage at 00:00-00:23.  Once Defendant was in handcuffs, Dionisi reached inside Defendant's waistband.  *Id*. at 00:26-00:32.  Craig asked Defendant, "yo, is it cocked or what?"  *Id*. at 00:35-36.  Defendant replied, "yeah, it's on safety though."  *Id.* at 00:37-00:40.  Dionisi recovered a firearm from Defendant's waistband at "[t]he front right portion of his groin area."  *Id.* at 00:40-43; Tr. at 22:11-24.  The Officers then escorted Defendant to their vehicle and placed him in it.  *See*, CCTV Footage at 02:38-48; *See also*, Body Cam Footage at 01:19-02:02.

Defendant moves to dismiss the seized firearm and his post-arrest statements, contending that Dionisi stopped and frisked him without reasonable suspicion in violation of his Fourth Amendment rights.  *See*, Def. Mem. at 1.  The Government counters that Dionisi credibly testified that he had reasonable suspicion to stop and frisk Defendant based on his training and experience.  *See*, Opp'n at 4.  Defendant maintains that Dionisi's testimony is not credible because the CCTV footage conflicts with Dionisi's account of the incident.  *See*, Reply at 1.  For the reasons set forth below, the Court finds that Dionisi lacked reasonable suspicion to stop and frisk Defendant and the motion to suppress evidence is granted.

---

[3] Dionisi's body camera recording does not play any audio for the first 30 seconds because "there's a 30-second buffer for body cameras."  Tr. at 35:5-7.

## LEGAL STANDARD AND DISCUSSION

The issue presented here is whether Dionisi had reasonable suspicion to justify his stop and frisk of Defendant under *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. A *Terry* stop allows a police officer to conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. In *Arizona v. Johnson*, the Supreme Court set forth the two-step analysis for determining whether a stop and frisk under *Terry* is constitutionally permissible. *See*, *Johnson*, 555 U.S. 323, 325 (2009); *See also*, *United States v. Watson*, 2021 WL 535807, at *2 (S.D.N.Y. Feb. 11, 2021) (discussing the two-step analysis set forth in *Terry* and *Johnson*).

Under the first prong, an officer may stop an individual if he has reasonable suspicion to believe that criminal activity has occurred or is about to occur. *Watson*, 2021 WL 535807, at *2 (citing *Terry*, 392 U.S. at 30-31). Under the second prong, an officer may frisk a lawfully stopped individual, if the officer has reasonable suspicion to believe that the person "is armed and presently dangerous to the officer or to others." *Id.* (quoting *Terry*, 392 U.S. at 24) (internal quotation marks omitted).

Since the Government searched and seized Defendant without a warrant, the Government must demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. *See*, *United States v. Strachon*, 354 F. Supp.3d 476, 483 (S.D.N.Y. 2018); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980). Physical evidence or statements obtained as a result of an illegal stop, search, or seizure must be suppressed. *United States v. Ford*, 415 F. Supp.3d 310, 314 (E.D.N.Y. 2019) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963)).

Under *Terry*, police officers may stop someone only when they have "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Freeman*, 735 F.3d 92, 95-96 (2d Cir. 2013) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted). In reviewing reasonable suspicion determinations, courts must "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for *suspecting legal wrongdoing*." *Id.* at 96 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (emphasis added) (internal quotation marks and citation omitted). While courts evaluate the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," courts must "not merely defer to the police officer's judgment." *Id.* (internal quotation marks and citation omitted). Moreover, such a stop must be "justified at its inception." *Id.* (quoting *Terry*, 392 U.S. at 20).

As an initial matter, the Court must determine when Dionisi "seized" Defendant in order to assess whether there was reasonable suspicion for the stop at its inception. *Id.* (citing *Terry*, 392 U.S. at 20). A "seizure" under the Fourth Amendment occurs once an officer, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Freeman*, 735 F.3d at 96 (quoting *Terry*, 392 U.S. at 19 n.16); *See also*, *United States v. Weaver*, 975 F.3d 94, 101 (2d Cir. 2020) ("Actually touching a suspect with the intention of frisking him, of course, constitutes a search.").[4] As Defendant correctly asserts, the *Terry* stop occurred when Dionisi put his hand on Defendant's chest to prevent Defendant from moving forward. *See*, Def. Mem. at 11; Tr. 66:6-13; *See also*, CCTV Footage at 01:20.

Thus, the central issue here is whether reasonable suspicion existed when Dionisi stopped Defendant. *See*, *Watson*, 2021 WL 535807, at *3. Dionisi decided to approach Defendant because

---

[4] The Second Circuit granted *en banc* review of this case and heard argument on April 20, 2021. *See*, *United States v. Weaver*, Case No. 18-1697, Dkt. Entry No. 159 (2d Cir. Apr. 20, 2021). The decision is pending.

he suspected that Defendant was rolling a marijuana cigarette while sitting on an electrical box on Pacific Street. *See*, Tr. at 18:21-25, 41:23-25. Dionisi initially did not see any object in Defendant's hands and did not make any other observations that might have indicated that Defendant was engaged in criminal conduct, such as handing packages to individuals in exchange for money. The Court finds that Dionisi lacked reasonable suspicion to believe that Defendant had a marijuana cigarette in his hands when he first saw Defendant or as he approached Defendant.

The Government attempts to distinguish this case from *Weaver* by arguing that Dionisi had reasonable suspicion to believe that Defendant was armed based on his observation of Defendant's actions, combined with the fact that Defendant was in a high crime area. Opp'n at 12-13. In *Weaver*, the Second Circuit held that, while the high crime nature of an area may inform an officer's observations, mere presence in a high crime area, without more, cannot establish reasonable suspicion or justify a search and seizure. *See*, *Weaver*, 975 F.3d at 105 (citing *Freeman*, 735 F.3d at 101). Dionisi did not see what Defendant was holding in his hands. His suspicion that Defendant was rolling a marijuana cigarette was based solely on the reputation of the vicinity of 1940 Pacific Street as "a high narcotics area." Tr. at 18:21-19:1. This is nothing more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. The generic label of the location as a "high narcotics area" cannot be a meaningful factor in a finding of reasonable suspicion because it has no individualized connection to Defendant. *See*, *Freeman*, 735 F.3d at 101; *See also*, *Padilla*, 548 F.3d at 188 (holding that a reasonable suspicion assessment should include more than the officer's familiarity with the neighborhood's high incidence of shootings and drug related crimes).

Indeed, Dionisi's suspicion should have been dispelled as soon as he saw that Defendant was holding a cellphone and not anything even remotely resembling a cigarette or any other type

of contraband, including a firearm. *See*, CCTV Footage at 01:15. Dionisi could have stopped Defendant only if he had reasonable suspicion supported by articulable facts that criminal activity was occurring or was about to occur. *See*, *Freeman*, 735 F.3d at 95-96. The Government has failed to provide any articulable facts as to why Dionisi continued to suspect criminal activity at this point. *See*, *United States v. Arenas*, 37 F. Supp.2d 322, 329 (S.D.N.Y. 1999) (finding that officers could not articulate any reason why they continued to suspect criminal activity when they testified that they "decided to stop [the defendant] and his companions, not because the officers believed the men to be committing a crime, but rather because they feared that the men would disappear into the subway system").

The Government contends that Dionisi lawfully frisked Defendant because Dionisi had reasonable suspicion to believe that Defendant was concealing a firearm in his waistband. *See*, Opp'n at 8-13. The Government conflates the reasonable suspicion required to justify a *Terry* stop and the reasonable suspicion required to justify a *Terry* frisk. In order to have a lawful frisk, there must have been a lawful stop. *See*, *Padilla*, 548 F.3d at 187 (citing *Terry*, 392 U.S. at 23-27). Although Defendant's stop and frisk occurred within seconds of each other, these analyses are separate and distinct. *See*, *Watson*, 2021 WL 535807, at *2 (citing *Johnson*, 555 U.S. at 326).

The Government contends that Dionisi had reasonable suspicion to frisk Defendant based on his training, his familiarity with the high crime nature of the area, and his observation of Defendant's movements. *See*, Opp'n. at 13. In particular, Dionisi mentioned two movements that purportedly were indicative of the concealment of a firearm. The first movement was Defendant's quick motion with his right forearm into his waistband when Dionisi approached him. Tr. at 20:3-4. The second movement was when Defendant "bladed" his body away from Dionisi as soon as he jumped off the electrical box. *Id*. at 20:8-10.

9

Contrary to Dionisi' testimony, the CCTV footage showed that, while sitting on the electrical box, Defendant did not move his right arm at all, let alone adjust his waistband. *See*, CCTV Footage at 01:16-19. Defendant moved his right arm towards his waistband and turned his body away from Dionisi only after he got down from the electrical box. *Id.* at 01:20. Additionally, the mere fact that Dionisi labeled Defendant's motion as "blading" does not establish that reasonable suspicion existed when Defendant turned his body away from Dionisi. "'Reasonable suspicion' does not mean simply accepting whatever circumstances are offered by the Government as necessarily demonstrating sufficient grounds to suspect 'legal wrongdoing.'" *Freeman*, 735 F.3d at 103 (citing *Arvizu*, 534 U.S. at 273).

Furthermore, Dionisi's purported observation, without more, cannot establish reasonable suspicion to frisk Defendant. In *Watson*, the court found that an officer had reasonable suspicion to frisk the defendant's fanny pack for a firearm because the officer saw a bulge of a "heavy-looking L-shaped object" in the fanny pack. *See*, *Watson*, 2021 WL 535807, at *6-7. In *Padilla*, an officer saw the defendant "reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline." *Padilla*, 548 F.3d at 189. The officer in *Padilla* determined that the defendant was concealing a firearm based on his experience, which included making eight to ten arrests of armed individuals who had made the same movement. *Id.* The officer also was able to explain why the defendant's motion was not an innocuous adjustment but had "distinctive consistency with the adjustment of a firearm." *Id*. Based on the totality of these circumstances, the Second Circuit found that the officer had reasonable suspicion to frisk the defendant. *Id*. To the contrary here, Dionisi did not see any bulge or object in Defendant's waistband or pants even as he was standing inches away from Defendant with the flashlight shining on Defendant.

In sum, the Court concludes that the Government has failed to establish its burden of proving that Defendant's stop and subsequent search were justified under the Fourth Amendment. Accordingly, the seized firearm and Defendant's post-arrest statements are suppressed as fruits of an unlawful search and seizure.  *See*, Ford, 415 F. Supp.3d at 314 (citing *Wong Sun*, 371 U.S. at 484-88).

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to suppress the seized firearm and Defendant's post-arrest statements is granted.

SO ORDERED.

Dated: Brooklyn, New York
July 14, 2021

/s/
DORA L. IRIZARRY
United States District Judge